SAMUEL McBURNEY *et al. v.* GLENMARY COAL & COKE COMPANY *et al.*

(*Knoxville.* September Term, 1908.)

1. **MINES AND MINERALS.** Severance by deed does not create distinct estate in the technical sense; ownership is consistent with other rights.

The minerals in land may be by deed of conveyance severed and separated from the rest of the land and become subject to the laws of devise, descent, conveyance, levy, and taxation, yet a conveyance of the minerals in a tract of land does not create a separate and distinct estate in the technical sense, but rather separates a part of the property from the balance, and the right of ownership and control of the minerals may be consistent with all other rights of ownership to the surface and other parts of the land. (*Post, pp.* 287-300.)

Cases cited and approved: Murray v. Allred, 100 Tenn., 100; Coal Co. v. Mellon, 152 Pa., 286; Delaware & Hudson River Co. v. Hughes, 183 Pa., 69.

2. **SAME.** Conveyance of a particular mineral excludes other minerals.

Where a particular mineral is conveyed by a specific term covering it, and not by a general term, only that mineral will pass, and all other minerals will remain with the property of the owner of the fee. (*Post, p.* 296.)

3. **SAME.** Removal of mineral ends right or interest of the owner thereof in the land.

Where a mineral which has been conveyed is taken or removed from the land, the owner of such mineral ceases to have any other right or interest in the land, which then belongs to the owner of the fee and surface. (*Post, p.* 296.)

4. **SAME.** Possession of surface by grantor of minerals inures to benefit of grantee of minerals as against third parties.

Where the grantor of a mineral interest and mining rights in land continues in possession of the surface, his such possession inures to the benefit of the grantee of such rights as against third parties. (*Post, pp.* 297-299.)

5. **SAME.** No way of necessity over the land of a stranger.

A grantee of minerals cannot assert a way of necessity over the land of a stranger to remove such minerals. (*Post, p.* 299.)

Cases cited and distinguished: Pearne v. Coal, etc., Co., 90 Tenn., 627; Logan v. Stogdale, 123 Ind., 376; Ritchey v. Welsh, 149 Ind., 214.

6. **ADVERSE POSSESSION.** By owner of fee on part of homestead for seven years before death of homesteader, and continued for seven years thereafter perfects title to boundaries.

Where an actual inclosure and adverse possession on a part of the homestead tract of land was made and held by the remainderman or reversioner for more than seven years before the death of the homesteader, and afterwards continued and held, without extension, under a will describing the boundaries, for more than seven years, the possession extends to the described boundaries, and perfects the title to the whole tract. (*Post, pp.* 300-302.)

7. **SAME.** Disclaimer of title prevents possession being adverse or under color of title, when.

Where, before the acquirement of a perfected title by adverse possession of land, the one in possession disclaims title, his possession thereafter will not be adverse or under color of title. (*Post, p.* 303.)

8. **APPEAL.** Relief based upon a technical disclaimer and upon a constructive disclaimer and clearly made out case will be granted in supreme court, though decree was not asked for in lower court.

Where the answer of one defendant expressly disclaimed title to the coal sued for in all the land except that in certain spe-

McBurney v. Coal & Coke Co.

cific land described in the answer; and the answer of another defendant denied generally that complainants were the owners of the coal sued for, and then described a number of tracts which it claimed to own, such answer does not show a technical disclaimer, but where all the parties throughout the entire litigation treated such answer as a disclaimer of title to the coal in all the lands sued for, except in those specifically described and claimed therein, and where complainants certainly established an undisputed title to the coal in all the lands outside of the boundaries so specifically claimed by defendants, and were entitled, as a matter of course, to a decree for such coal, but failed and neglected to ask for such relief in the chancery court and also in the court of chancery appeals, such decree will be allowed in the supreme court upon the condition of onerating complainants with the costs. (*Post, pp.* 303-307.)

FROM MORGAN.

Appeal from the Chancery Court of Morgan County. —D. L. LANSDEN, Chancellor.

JAMES A. MONROE, LUCKY, SANFORD & FOWLER, and BROWN & CASSELL, for complainants.

TEMPLETON, LINDSAY & TEMPLETON and JAMES F. BAKER, for defendants.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

This is an action of ejectment to recover of the defendant the coal in certain lands described in the pleadings. Complainants do not claim the surface, but only the coal mineral in a certain tract of land covered by grant, No. 21879, and entry, No. 1935. Complainants claim that they acquired this mineral interest as owners of entry, No. 1935, and grant, No. 21879, issued to Thomas B. Eastland on the 29th of January, 1838.

Complainants show a perfect title under his entry and grant to the lands containing the minerals involved in this controversy. The theory of the bill is that there had been a severance or segregation of the stone minerals in said land, and that the possession of the defendants had not been extended to or covered the stone mineral interests therein. It was alleged that defendant Edward R. Diden in 1851-1856 purchased from Jas. S. Duncan four different tracts of land lying within the boundaries of complainants' entry, No. 1935. These deeds describe one tract of four hundred and seventy acres of land, another tract of five hundred acres, and a tract of four hundred acres, and a tract of about five hundred acres of land, only a portion of which is situated within the complainants' title. These deeds describe the lands by metes and bounds, and purport to convey the entire fee from Jas. S. Duncan and Edw. R. Diden. It appears that Jas. S. Duncan purchased

this land from one Julian F. Scott, who by his deed reserved the stone coal. The theory of the bill, therefore, is that the reservation of the stone coal in the deed from Julian F. Scott was a severance of the mineral estate from the surface right, and that therefore the person in possession under any of the deeds from John S. Diden only held the surface, and that his possession would not inure to the benefit of the mineral estate in the land. Complainants' original insistence in the present bill is that the possession of E. R. Diden of this land was a possession of the surface only, and not of the mineral, and that, since complainants' entry 1935 and grant 21879 constituted the oldest title appearing in the record, the mineral interest in said land was not barred by the adverse possession by Diden and his devisees.

This grant and the entry on which it is based include the lands in litigation. It appears that complainants have deraigned a perfect chain of title by connected mesne conveyances from the grantee to themselves.

Defendants, however, insist complainants are barred against a recovery of these lands because of defendants' possession under the statute of limitations.

It appears that in 1851-1856 Edward R. Diden purchased from one James S. Duncan four tracts of land lying within the boundaries of entry, No. 1935, and Eastland grant. Duncan, it appears, in 1851 obtained a deed for two thousand acres from Julian F. Scott, to whom a grant for the same had been issued by the

State on June 19, 1851. The four tracts of land purchased by Edward R. Diden from James S. Duncan comprised about seventeen hundred acres. The first of these tracts embraced four hundred and seventy acres, and was acquired by E. R. Diden from J. S. Duncan on April 4, 1851. On May 7, 1852, Duncan executed to E. R. Diden a deed purporting to convey five hundred acres. On March 1, 1855, Duncan executed to E. R. Diden a deed for a tract containing four hundred acres. On February 13, 1856, Duncan executed a deed to E. R. Diden for three tracts, one of which lies outside the lands in controversy.

The court of chancery appeals reports that James S. Duncan, from whom E. R. Diden had purchased these several tracts of land, is not affirmatively shown to have other title than the deed made by Julian F. Scott, which appears to be without date, but which is shown to have been acknowledged before the county court clerk of Morgan county on the 2d day of July, 1851.

It appears that the grant to Julian F. Scott was No. 27992, based on entry 1787. There was another grant, issued to Julian F. Scott, covering entry 2281. The court of chancery appeals was of opinion that it does not appear, by the description in Duncan's first deed to E. R. Diden, that the land conveyed was claimed under grant No. 27992, the J. F. Scott grant; but, on the contrary, it is said to be a part of the grant, No. 26464, and a part of grant, No. 27739.

The deed made by Julian F. Scott to James S. Duncan, conveying lands estimated at two thousand acres, appears to have been acknowledged on the 2d day of July, 1851, or subsequent to the date of James S. Duncan's first deed to E. R. Diden, which was on the 4th day of April, 1851. This deed from James S. Duncan to E. R. Diden describes the land by specific boundaries, with covenants of seizin and general warranty, and containing this clause, "excluding all the stone coal in said bounds." It appears that in none of the deeds of Duncan to E. R. Diden, and in no deed subsequent to the deed of Julian F. Scott to James S. Duncan, was any exception made as to the stone coal.

The court of chancery appeals finds, Judge Barton delivering the opinion of the court, that E. R. Diden in 1850 or 1851 moved upon the tract of four hundred and seventy acres described in the deed of April 4, 1851, from J. S. Duncan to E. R. Diden; that E. R. Diden cleared from forty to fifty acres on said tract, and occupied it as a residence from that time until his death in 1871, and that during that time he was in the open, notorious, continuous, and peaceable possession of this place, holding it adversely to all the world; and that no part of this possession was outside of the 470-acre tract. That court further reports that:

"After the death of E. R. Diden in 1871, his son, John S. Diden, lived upon this place with his mother, the widow of E. R. Diden, until 1879, and that the possessions were still kept up on this place until about

1894, and that from April 4, 1851, until 1894, a period of more than forty years, there was a continuous adverse possession of forty or fifty acres of cleared land and improvements, and this possession was under the color of title of the deed from Duncan to E. R. Diden, dated 4th of April, 1851, which purports to convey an estate in fee."

Defendants contended in the court below that by certain acts of E. R. Diden his possession was extended by construction to the entire boundaries claimed by him under all five of the deeds executed to him by J. S. Duncan, comprising altogether seventeen hundred acres. On this subject the court of chancery appeals finds as follows:

"It further appears, and we find, that shortly after Diden procured his last deed from Duncan, in 1857 or 1858, Diden had the lands run out, and went around the entire outside boundary of all of his lands, and marked the outside line, so as to have a clearly marked line between him and adjoining owners.

"It appears that he adopted a mark of his own; it being a cross hack or mark. It further appears that it was his custom, so long as he lived thereafter, to go around his lines at frequent intervals—the proof shows about once every year—and re-mark the lines, marking not only the line trees, but pointers, so as to clearly show the location of his lands. As we say, he is shown to have done this from probably 1857 or 1858 up to the time of his death, which occurred in 1871. It is also

shown that in 1859 E. R. Diden made a will and treated his farm as one entire tract, and this will was acknowledged and registered, and it is shown that he thus consolidated all the tracts, and from that time on until his death in 1871 held them under the consolidations; and it is further said, which is true, that in 1866 he made the will, which was afterwards established, under which the defendant John S. Diden claims, in which he gives the boundaries of the tract. as now claimed by John S. Diden, and it is said that he held under that until his death, and his son held it afterwards.

"While these are facts, we are of opinion that that treatment of the place by making a will, or by referring to it as his farm, or by marking the outside lines of all his tracts so to make it one tract, could not affect the rights of the parties under the statue of limitations. It must be remembered that the rights of defense and of title acquired under the statute of limitations are statutory rights, which can only be acquired on the terms and conditions prescribed by the statute, and under the limitations therein provided. The possession which becomes effective either in giving a defensive right or in procuring and tolling the title to land, is aside from actual inclosures purely a constructive one given by the statute.

"Now, the words of the statute are: 'That any person having had by himself or those under whom he claims seven years adverse possession, . . . hold-

ing by conveyance, devise, grant, or other assurance of title purporting to convey an estate in fee . . . is vested with a good and indefeasible title in fee to the land described in his assurance of title.'

"And the holding has been, in accordance with this language, that the constructive possession herein provided for must extend to the bounds of the color of title under which a party claims the land on which his possession is located.

"Now, when we come to examine the facts in this case, we find that E. R. Diden's possession, except the occasional acts of possession we have referred to of the coal mines, was within the bounds of the 470-acre tract which was held under the deed of the 4th of April, 1851. If demand had been made upon him at the time he was holding the possession for a showing of title as to the land covered by his inclosures, he would simply have produced his deed of the 4th of April, 1851, and we are of opinion that the constructive effect cannot be extended beyond the bounds of that deed. To hold that, by marking lines covering other tracts, a man could consolidate the tracts or extend the effect of his possessions upon a single tract, would be in effect to hold that a man could by his own action amend and extend the effects of the statute of limitations. So we think the wills executed by E. R. Diden could have no effect, notwithstanding the fact that they were acknowledged and recorded, because he was not claiming under his will, but simply preparing a paper

for others to claim under him. We are therefore of opinion that the possession held by E. R. Diden himself of the inclosed lands did not in any of its effects go beyond the bounds of the deed of April 4, 1851. In this conclusion we concur.

"It further appears that on September 10, 1866, E. R. Diden made a will, revoking one made in 1859, wherein he described all of the lands comprised in the Duncan deeds as one tract. In this will he provided that upon his death it would all become the property of his son John S. Diden, provided his wife, Esther Diden, did not survive him, in which case, quoting from the will, 'she is to have dominion over this farm whereon we live and to be supported until her death, and at her death John Steven Diden, my youngest son, takes it for his own property for himself, heirs, and assigns, freehold, forever.' It appears that E. R. Diden died in 1871, and his widow, Esther Diden, survived him until 1888, during which time she and her son, John S. Diden, lived at the old home place on the 470-acre tract until 1879, when John moved away and took a possession outside the 470-acre tract, and at the place designated on the map as 'House John S. Diden.' "

On the subject of this possession the court of chancery appeals reports:

"The possession known as the 'John Diden possession,' and marked on the map as house and field, lying on both sides of the county road, and about the center of the property claimed by John S. Diden under his father's will.

"We find from the evidence," says the court, "that John S. Diden went to his place after his father's death, and after his marriage in the year 1879, cleared up the tract of land, and built a house. He cleared from twenty to thirty acres at this place, improved and inclosed the same, built a house, and has remained on it and in possession of the same continuously to this time, a period of some twenty-eight years before the bill was filed in this case. His occupancy of this place had been peaceful, continuous, open, and notorious, and adverse to all, claiming under his father's will, which purports to convey a fee, and for a period of twenty-eight years prior to the filing of the bill.

"On December 24, 1884, John S. Diden and wife conveyed to J. H. Parker & Co. the mineral interest in certain contracts designated on the maps as 'John S. Diden to Glenmary Coal & Coke Co.' extending to the W. L. Davis tract on the east. The conveying clause of that deed is as follows: 'The party of the first part has this day optioned and sold to John H. Parker & Co., the second named party, all of the minerals, etc., coal, iron, fire clay, gas, oil, lead, sulphur, marble, rock, etc., in or under the certain tract of land herein set forth and described' (embracing three hundred and forty-two acres). The deed also contains the further provision: 'Now it is agreed that said party shall have the necessary timber off of said land for the purpose of carrying on any work or business they may engage in in the pursuit of mining, etc., and it is further agreed

that they have the right to enter upon said land in search of coal, oil, etc., at any time they choose within the next two months.'

"On March 19, 1890, Parker & Co. executed a deed for the same mineral interest to G. W. Chandler, and on the same day Chandler deeded it to the Glenmary Coal & Coke Company."

As already observed, complainants seek by this bill to recover all the coal mineral in the lands lying within their Eastland grant and the tract described in the will of E. R. Diden, except the land covered by the 470-acre tract conveyed by James S. Duncan to E. R. Diden April 4, 1851. In his answer the defendant John S. Diden claims the land described in his father's will; but it is shown that he conveyed the W. L. Davis tract, with the minerals, and also the minerals in the tract comprising two hundred and forty-two acres, described and designated on the map as conveyed by John S. Diden to Glenmary Coal & Coke Company, and the Glenmary Coal & Coke Company, claims both of these tracts under John S. Diden.

The defense relied on is possession under the statute of limitations. The position relied on is that no one has the "Diden old home place," or has the "Diden old field" held by old man E. R. Diden. The court of chancery appeals finds:

"There was some forty or fifty acres cleared up at this place, and that E. R. Diden, the father of John S. Diden, moved upon this tract in 1850 or 1851, his

deed from Duncan being dated April 4, 1851, and he then made these clearings and improvements, though the original clearings and improvements were doubtless extended, and he lived on this place until his death in 1871. During that time he was in open, notorious, peaceful possession of this place, holding it adversely to all the world.

"This possession was wholly within the boundaries of the 470-acre tract first purchased and covered by the deeds from Duncan to him, dated 4th of April, 1851. It is not denied that E. R. Diden and his son, John S. Diden, obtained a perfect and complete title to this tract of four hundred and seventy acres, and as to this tract the complainant on the hearing dismissed his bill."

In respect of the possession of the coal mineral interest covered by John S. Diden to Parker & Co., December 24, 1884, and now held by the Glenmary Coal & Coke Company under mesne conveyances, the court of chancery appeals report:

"That under this conveyance, made by Diden to Parker & Co., he (Diden) has remained in the actual adverse possession of this land, not claiming, however, the mineral interest as against his grantee and their successors; and the legal question presented is as to the effect of this holding of Diden as against the complainant. It is not claimed, as we understand, that Parker & Co., jointly, or the Glenmary Coal & Coke Company, have themselves, since the deed made to them

by Diden, had any actual possession of the coal or any part of the land west of the W. L. Davis tract and within the bounds of the conveyance to them by the deed of Diden made the 24th of December, 1884."

However, the court of chancery appeals held as a matter of law, although John S. Diden executed this deed to Parker & Company before he had acquired, by adverse possession or otherwise, any title to the minerals therein, yet his possession at the place designated "House John S. Diden" inured to the benefit of Parker & Co., vesting in them title to the minerals in the 242-acre tract at the expiration of seven years from the establishment of that possession in 1879, and as to all these interests dismissed complainants' bill. A decree, however, was pronounced in favor of complainants against Young & Foster for the mineral interests on a tract comprising four hundred acres, which will be noticed on their appeal.

Complainants appealed from so much of the decree as denied them any recovery of the mineral interest embraced in the other tracts, and their first assignment is that the court of chancery appeals erred in not pronouncing a decree in favor of complainant Samuel McBurney, and against the Glenmary Coal & Coke Company, for the coal in the 342-acre tract, which is particularly described in the deed executed by John S. Diden to Parker & Co. on December 24, 1884. This tract lies in the northwestern portion of the Diden lands, and

121 Tenn—19

is described on the plat as "John S. Diden to Parker & Co., December 24, 1884," and lies between the north line of the Diden lands and the south line of the Glenmary Coal & Coke Company's lands, and extends on the east to the W. L. Davis tract.

The position of defendant is that after the execution of the deed to Parker & Co., on December 24, 1884, the possession of John S. Diden at his home place, which was begun in 1879, inured to the benefit of Parker & Co., and vested them with title to the mineral and mining rights therein described.

The question propounded on this assignment of error is *res integra* in this State, and presents a question of much difficulty and perplexity. The nature of the estate created by the severance and segregation of the mineral interests in a tract of land under a separate conveyance seems to be well established by the authorities. In *Delaware & Hudson River Co.* v. *Hughes*, 183 Pa., 69, 38 Atl., 569, 38 L. R. A., 826, 63 Am. St. Rep., 743, it was said:

"The general principles regulating the titles to upper and lower estates in the earth's crust are pretty well settled by our own cases. The ownership of the surface carries with it, if there be no obstacle to the application of the general rule, title downwards to the center of the earth and upwards indefinitely. So long as mineral deposits remain in place, they are part of the freehold, and pass with it by deed, gift, or other form of conveyance; but, when the minerals are re-

moved from their position or bed by mining, they become personal property, and are sold like other personal chattels.  If the owner grants to another the right or privilege of taking coal from his lands, this grant, if not an exclusive one, is not the grant of an interest in land, but of an easement or incorporeal right, which leaves the title to the coal in place remaining in the grantor.  But a grant of all the coal, or of the exclusive right to mine the coal, is a sale of the coal in place. The conveyance of the coal creates in the vendee an interest in land.  The deed or other conveyance is within the recording acts, and is subject to all the rules and regulations governing conveyances of the surface.   It may convey an estate in fee simple in the coal or other mineral, or any lesser estate, in the same manner and by the same words of grant made use of in conveyance of the surface.   When such a conveyance has been made of the coal or other mineral, it works a severance of the estate so conveyed from the surface, and, if the deed be recorded, it is constructive notice to all the world of the fact of  severance.   Thenceforward  the owner of the soil may cultivate, inclose, and reside upon his estate for any length of time; but his possession will not extend below it.  It will not grasp or affect in the slightest degree the estate below him which has been severed by the deed," etc.

In Barringer & Adams on the Law of Mines and Mining, p. 36, the rule is thus stated:

"A conveyance of all the minerals, or a defined part or kind thereof, in or under a tract of land, passes an estate therein in fee. If the description is sufficient to contain the whole of the minerals, it is unimportant whether they be described as such, or the conveyance be of the usufructuary rights to them, provided those rights are equivalent to the permanent or absolute ownership. Such an owner has all the rights of an owner of land in fee, with the same remedies to assert and defend those rights and to protect his title. The ownership of the mineral is vested immediately upon the delivery of the conveyance. The minerals in place, then, being land, are conveyed in the same manner and are subject to the same rules, as regards their transfer, as land is. The statute of frauds and the law governing the transfer of interest in real estate are applicable to the transfer of such interest in the minerals. A separate estate in the minerals may be created, not only by an affirmative grant, but also by reservation or exception in a conveyance of the land."

In *Murray* v. *Allred*, 100 Tenn., 100, 43 S. W., 355, 39 L. R. A., 249, 66 Am. St. Rep., 740, this court recognized this doctrine and quoted with approval from *Chartiers Block Coal Co.* v. *Mellon*, 152 Pa., 286, 25 Atl., 597, 18 L. R. A., 702, 34 Am. St. Rep., 645, as follows:

"It often happens that the owner of a farm sells the land to one man, the iron or oil or gas to another, giving each purchaser a deed or conveyance in fee simple

for his particular deposit or stratum, while he retains the surface for cultivating purposes precisely as he held it before. The severance is complete for all legal and practical purposes. Each of the separate layers or strata becomes a subject of taxation, of incumbrance, levy, and sale, precisely like the surface."

The next question presented is what constitutes an adverse possession of the mineral strata or deposit, after the title thereto has been separated from the title to the surface.

In White on Mines and Mining, p. 32, the principle is thus stated:

"But, where there has once been a severance of the title to the minerals from the title to the surface, the presumption of ownership in the minerals no longer exists in favor of the party in possession of the surface; but, on the contrary, the ownership of the minerals is supposed to follow the title to the same, and, in the absence of proof of the possession of the mineral strata, evidence of the possession of the surface will not avail to establish a title by adverse possession to the minerals."

Barringer & Adams thus state the rule at pages 59 and 60:

"Where the ownership of minerals in place is severed from the ownership of the soil or surface, the mere possession of the latter is not such a possession of the minerals beneath as to the adverse. Nor will the nonuser of the minerals, or the right to dig them, by the mine

owner, convert the possession of the surface owner into an adverse possession of the minerals. The latter must perform some act adverse, hostile to the rights of the mine owner, which prevents him from exercising his rights. The surface owner, setting up the statute, must establish a possession of the mine as such, independently of his possession of the surface. Such a possession must be actual, notorious, exclusive, continuous, peaceable, and hostile for the statutory period; and in these respects, the surface owner is in no better position than the stranger. No act or acts on his part will establish title in him which would not give title to a stranger. Actual possession is taken by the opening of mines and carrying on of mining operations."

On this subject the exact findings of the court of chancery appeals are as follows:

"Since the conveyance by John S. Diden to Parker & Co., he [John S. Diden] has remained in the actual adverse possession of the land, not claiming, however, the mineral interests, as against his grantees and their successors; and the legal question presented is as to the effect of this holding of Diden as against the complainant. It is not claimed, as we understand, that Parker & Co., Chandler, or the Glenmary Coal & Coke Company have themselves, since the deed made to them by Diden, had any actual possession of the coal or any part of the land west of the W. L. Davis tract, and within the bounds of the conveyance to them by the deed of Diden made the 24th of December, 1884.

McBurney v. Coal & Coke Co.

"The claim on behalf of the complainants is that they are entitled to recover this mineral interest because, up to the time of Diden's conveyance to Parker & Co., Diden had been in actual, adverse possession of the land only about five years. And the insistence is that the effect of Diden's deed was to sever the coal in this tract from the rest of the estate, and that thereafter his possession (Diden's) did not protect the coal interests, and that, the Glenmary Coal & Coke Company and Parker & Chandler not having themselves had possession, they have acquired no defense to the complainants' older and better paper title."

Upon these facts that court held:

"In this case the conflict is not between parties claiming under the same chain of title, but between parties claiming under entirely separate and distinct chains of title. It appears to us that the better, safer, and most sensible rule would be to adopt the rule established in those cases where there is a joint or mixed possession by heirs and life tenants, or by mother and child, guardian and ward, etc., where the possessions are held to be consistent, and in harmony, and all under the same title. While it is true that coal, minerals, etc., may be by deed severed and separated from the rest of the land and become subject to the laws of devise, descent, and conveyance, as in their nature they are inseparably mixed and connected with the balance of the land, a conveyance of the minerals in a tract of land does not in the technical sense of the word create a separate

and distinct estate; but it separates a part of the property from the balance, and the right of ownership and control of coal and other minerals may be, and usually is, in entire harmony and consistent with all other rights of ownership to the surface and any other parts of the land. Where a particular mineral, as oil, coal, iron, or marble, is conveyed by a specific term covering that particular mineral, and not by a general term, only that would pass, and all other minerals would remain with the property of the owner of the fee; and, where a mineral which has been conveyed is taken or removed from the land, the owner of such a mineral ceases to have any other right or interest in the lands, and the land then all belongs to the owner of the fee and surface. The right to own and take a mineral upon a tract of land is confined to the ownership and taking alone, and cannot otherwise interfere with the rights of dominion and possession of the owner of the balance of the land. It is in reality simply a right to enter and go upon the land and take therefrom the particular mineral conveyed, and when that is done the right is exhausted.

"Under such a right, a possession can only be to the extent of occupying so much of the land as may be necessary and proper for such taking, and it is not at all inconsistent with the other rights of possession and ownership by the owner of the balance of the estate or land.

"The situation we have presented here is that the complainants and others under whom they claim were

claiming under a title entirely different and distinct from that under which the defendants claimed, and they were claiming the entire interest in the land, the surface as well as the minerals. They have only abated part of the claim—that is, the right to the possession of the surface, timber, etc.—because they have discovered that their rights to these interests at least are barred by reason of a possession held by the defendant Diden for a period of more than a quarter of a century, during which time they have left him undisturbed. It is true that in the meantime he has conveyed to another the right to the minerals that are upon this land, and the right to go upon the land and take therefrom these minerals, including the usual mining rights.

"We think the better rule and principle is to hold that such possession by a man who has conveyed the mineral rights to others is a possession in their interest, and in harmony with them, as well as for himself. If it be not so held in this case, we have this peculiar condition of matters presented: Diden by his deed conveyed to Parker & Co., and through them to the defendant Glenmary Coal & Coke Company, the mineral rights and mining rights; that is, the rights to go upon this land and take out these minerals, and to use the necessary timber on the land for mining purposes. Now, these parties are claiming under him and under his warranty, and, if they be ousted therefrom, can hold him liable on his warranty, and the loss will be occasioned by the entry of a party against whom he has been asserting an adverse right for a period of more

than a quarter of a century. In addition to that, Diden has certainly been holding the land for all purposes as against the complainants, and is entitled to hold all of it for all purposes, unless it be held that the coal has been severed, so as not to protect it; and if it should be decided under this holding that the complainants have not lost their title to the coal, by what right or on what principle could it be held that they can enter upon the surface in order to reach the coal, and can it be held that they have the right to use the timber upon the land for mining purposes?

"We think, in a case of this kind, as heretofore said, the better holding would be that the possession of Diden inured to the benefit of his grantee, to whom the mineral and mining rights were transferred. Suppose Diden had held this tract of land for a period of six years, and then had conveyed to a neighbor the easement for a right of way for a private road over his land, and after that continued in possession for a period of a quarter of a century; could the complainants have come in and recovered possession of the land covered by this road, on the ground that there had been a severance? We think not. We are of opinion, as stated, that the better and more sensible rule, and the rule which will best promote and carry out the purpose and policy of the statute of limitations, by quieting titles, etc., will be to hold that the possession by a grantor (of a mineral interest and mining rights in property) of the surface will inure to the benefit of

the grantee of such rights ·as against third parties; and such is our holding."

We are of opinion that the court of chancery appeals announces a better rule than that indicated in the authorities we have cited from other States. We are the better contented with this rule in view of the fact that there would be no way of putting complainant in possession of these minerals if his title thereto should be established. The adverse possession of the defendants has deprived the complainant of an easement to remove this coal from defendant's premises, even if it belonged to complainant. Complainant could not assert a way of necessity over the land of defendant Diden to remove the minerals. The case of *Pearne* v. *Coal Creek Mining & Mfg. Co.,* 90 Tenn., 627, 18 S. W., 402, was a case wherein a way of necessity was declared in a suit between parties and their privies, and it was not a case in which a way of necessity was asserted over the land of a stranger. In *Logan* v. *Stogdale,* 123 Ind., 376, 24 N. E., 135, 8 L. R. A., 60, the supreme court of Indiana, through Elliott, J., said:

"The theory is that, where land is sold that has no outlet, the vendor grants one over the parcel of which he retains the ownership. It results from this that a way of necessity cannot be successfully claimed over the land of a stranger, and, if the appellant here were asserting a right of way over a stranger's land, she could not succeed."

See, also, *Ritchey* v. *Welsh,* 149 Ind., 214, 48 N. E., 1031, 40 L. R. A., 106.

It is conceded that, as against the defendants, the complainant McBurney has no title or right of possession in the part of the land embraced in defendant's possession. There is no privity of contract in the estate between the complainants and defendants, but as to each other they are as strangers, and under well-settled principles there can be no way of necessity or right of easement over the defendant's land to remove minerals which may belong to complainants.

Complainants also assign as error the refusal of the court of chancery appeals to pronounce a decree in their favor for the coal in so much of the homestead tract as lies between the 470-acre tract and the 342-acre tract.

The court of chancery appeals held that complainants' title to the coal in this tract was divested by virtue of either the possession of the widow Diden after the homestead was laid off in 1880 or by John Diden's possession at his home place. It is insisted on behalf of complainant that his right of recovery is not defeated by either of these possessions for the following reasons:

(1) The court of chancery appeals, in its additional findings, expressly found that the possession held by Mrs. Diden was the old E. R. Diden home place possession, and was never extended outside the boundaries of the 470-acre tract. That court also found that E. R. Diden held possession of the 470-acre tract from 1851 until his death in 1871, and that prior to his death he had acquired title to that tract.

(2)   With reference to the John S. Diden home place possession, in its first opinion, the court of chancery appeals found that he (Diden) had a possession for more than seven years before this suit was brought, after the death of his mother, within the tract now in question. .

In its additional findings that court reported upon this subject as follows:

"The proof shows, and we find, that John Diden first cleared six acres in 1879 at the point where he now lives, but that very soon after that he extended his inclosures so as to cover forty or more acres, and that these extensions and inclosures have been there from shortly after he cleared the land until now, and we understand the effect of the proof is to show that these improvements made by John Diden were partly and for a considerable part within the lines of the homestead tract assigned to his mother, and part of his lines were outside of that tract."

It is insisted on behalf of complainants that this small possession across the homestead line, which was held by John Diden, could not, by construction, extend beyond the actual inclosures previous to the widow's death, because the right of possession had been vested by the court in the widow, nor could it extend by construction after her death, and the life estate had fallen in, because Diden had the acquired title to the small boundary thus inclosed, and there were no extensions of the actual clearings or inclosures thereafter.

The substance of the finding of the court of chancery appeals is that the possession of John S. Diden, embracing that part of the possession which was included in the widow's assignment of dower, was kept up by John S. Diden all the time. His mother died in 1888, and John S. Diden continued his possession from 1888 until the bringing of this suit, a period of fourteen years, and he had a possession of one or two years outside of said 470 acre tract, when dower and homestead were assigned to his mother. It thus appears that he had possession seven years when dower was assigned to his mother. But John S. Diden had had his own new possession under his father's will on these lands for one year and more when dower and homestead were assigned to his mother. He continued these possessions fourteen years after his mother's death. We think, therefore, the title of John S. Diden is perfected by the statute of limitation as to all lands claimed by him, including this particular portion of his land embraced within the assignment of homestead and dower, and outside of the 470-acre tract, and south of the lands in which he had sold the mineral to the Glenmary Coal & Coke Company.

We therefore are of opinion that this assignment of error should be overruled.

In conclusion, we find no error in the decree of the court of chancery appeals in its disposition of the alleged claim of Young & Foster to the minerals in the three hundred and ninety-seven acres. The court of

chancery appeals properly held that John S. Diden had not acquired title to this 400-acre tract after the decree of 1884 by adverse possession. That court finds that in 1884, in the McBurney suit, John S. Diden did disclaim title to this 400-acre tract, and we concur with that court in holding that thereafter his possession was not adverse or under any color of title. It appears that in 1884 his title had not been perfected to this 400-acre tract by any continuous possession for seven years, and his possession after his disclaimer of title could not have that effect.

This disposes of this interest, and affirms the decree of the court of chancery appeals in adjudging that complainants are entitled to recover the coal interests in this tract.

In conclusion, we notice an additional assignment of error filed by complainant by leave of the court at the present term as follows:

"The court of chancery appeals erred in not pronouncing a decree in favor of complainant Samuel McBurney and against the Glenmary Coal & Coke Company and Jas. S. Duncan for all the coal left within the lands described in the original bill as amended, and outside of the tract described in the answers of defendants Duncan and Glenmary Coal & Coke Company."

It will be observed complainants sought in their original bill to recover of defendants all the coal contained in the Eastland grant, No. 21879, except the tract known as the "Elisha Chaney lands." At a later

date complainants dismissed the bill as to four small tracts and the 470-acre tract deeded by James S. Duncan to E. R. Diden on April 24, 1851. In his answer John S. Diden disclaims title to all the lands described in the bill, except the 1,700-acre tract described in E. R. Diden's will. Diden's answer expressly denies possession of claim to any of the land sued for, except that described in the answer. In its answer the Glenmary Coal & Coke Company denies generally that complainants are the owners of the coal sued for, but describes a number of tracts which it avers it owns. It it said some of these tracts lie outside of the land sued for.

The second and third tracts described in the answer are the two tracts that are designated on the map as the "Jno. Griffith tract" and the "J. C. Hamby tract," and the seventh and eighth tracts therein described, and the two tracts of land which lie inside of the boundary embraced in the Diden will, and known as the "W. L. Davis 157-acre tract," and the 342-acre tract lying west of the Davis tract. The Glenmary Coal & Coke Company has only set up title to these four tracts, and has disclaimed any interest in the balance of the land embraced in the description in the original bill.

The court of chancery appeals held that complainants had deraigned a good title from the Eastland grant and were entitled to recover the coal in the land sued for, except the lands held by adverse possession under the statute of limitations, located inside the

land embraced under the Diden will and the John Griffith and J. C. Hamby tracts. Now it claimed that the maps sent up with the transcript and made a part of the findings of fact of the court of chancery appeals show a large boundary of land sued for which is not covered by any deed or title papers filed in the record by either of the various defendants, and to which under the findings of the court of chancery appeals, complainant Samuel McBurney has an absolute and undisputed title. The chancellor, however, dismissed complainants' bill as to the coal in all of the land sued for in said Eastland grant as against all of the defendants except Young & Foster, and this decree was affirmed by the court of chancery appeals. This statement of fact made by counsel for complainants in support of his additional assignment of error, we think, is established by the record.

Now, it is said under these facts complainant Samuel McBurney is entitled to a decree for all lands embraced in the original bill as amended, and not described in the answers of John S. Diden and the Glenmary Coal & Coke Company, and the failure of the chancellor and the court of chancery appeals to pronounce such a decree was a mere oversight; the attention of both court and counsel having been absorbed in the contest over the controverted questions.

As already seen, the answer of John S. Diden embraced a distinct disclaimer, while the answer filed on behalf of the Glenmary Coal & Coke Company only de-

121 Tenn—20

nied generally that complainants were the owners of the coal sued for, and then proceeded to describe a number of tracts which it claimed to own. This disclaimer on the part of the Glenmary Coal & Coke Company was not in exact accord with the rule. Says Gibson in Chancery, sec. 395:

"So if the bill seeks to recover more land than the defendant is in possession of, or is exercising acts of ownership over, he must disclaim as to so much of the land as he does not claim, or is not in possession of, or is not exercising acts of ownership over, and as to the part he does claim he must plead or answer. . . . Hence it is of great importance to the defendant to show distinctly in his answer by metes and bounds, or other definite description, the extent of his possession or claim, and to enter a full and absolute disclaimer as to the balance of the land sued for; otherwise, although he may defeat a recovery as to that part of the land which, outside of his answer, he really claims, he will be liable for the costs of the cause for contesting the complainant's right to all the lands sued for."

This is a clear statement of a familiar rule of pleading, and the answer of the Glenmary Coal & Coke Company, when tested by this rule, does not show a technical disclaimer. However, it appears that throughout this entire litigation all parties have treated the answer of the Glenmary Coal & Coke Company as a disclaimer of all lands sued for, excepting those specifically described in this answer. The complainant, however,

McBurney v. Coal & Coke Co.

failed in the chancery court, and also in the court of chancery appeals, to ask for the relief which he seeks by the assignment of error filed in this court. The complainant has certainly established an undisputed title to the lands outside of the boundaries claimed by the defendants, and was entitled, as a matter of course, to a decree for the minerals in all the lands embraced in his title papers which were not contested by the defendants; but, since complainant has been at fault in not embracing these matters in his decree, he must be onerated with the costs as a condition of permitting this relief.

The decree of the court of chancery appeals will be affirmed, as modified. Complainant will pay nine-tenths of the cost of appeal, and the defendants Young & Foster one-tenth.